## THE PILGRIM. .

## MANHATTAN LIGHTERAGE CO. v. THE PILGRIM.[1]

### (District Court, E. D. New York. August 2, 1893.)

SHIPPING—NEGLIGENCE—STEAMER'S SWELLS—EVIDENCE.

A lighter in tow alongside a tug dumped her deck load in the East river, and brought suit for damages against the steamer Pilgrim, alleging that the swells of the steamer caused the accident. It appeared by the evidence that the Pilgrim was not moving at a dangerous rate of speed at the time, nor did she pass unusually close to the lighter; that the tow met the swells head-on, and that no one on these boats anticipated danger on seeing the swells approach; that the heeling of the lighter onto her beam ends was one continuous movement, she never righting at all after the first swell struck her; and that she was a vessel cut down from a sharp, deep brig. *Held*, that it was not shown that the accident was due to the swells of the Pilgrim, and the libel should be dismissed.

In Admiralty. Libel for damages alleged to have been caused by steamer's swells. Dismissed.

Carpenter & Mosher, for libelants.
Shipman, Larocque & Choate, for claimants.

BENEDICT, District Judge. This action is brought by the owners of the lighter Alfred to recover of the owners of the Sound steamboat Pilgrim the damages arising from a dumping by the lighter Alfred of her cargo of iron rails into the east river on the occasion mentioned in the libel. The libel alleges that the dumping in question was the result of the swell of the Pilgrim, caused by her fault in passing the lighter at an improper rate of speed, and an improper proximity to the lighter. The accident occurred as the Pilgrim passed the lighter somewhere between a drill at the time moored on Diamond reef and the New York piers; the lighter being bound to Brooklyn, and being towed alongside the tug Howard, and the Pilgrim being bound from the eastward to her pier in the North river.

As regards the speed with which the Pilgrim was moving at the time she approached and passed the lighter, the evidence introduced in behalf of the defendants seems to prove that the Pilgrim's speed did not exceed eight miles an hour, which cannot be held to be a dangerous rate of speed at the place in question. In regard to the distance from the lighter at which the Pilgrim passed, the testimony from those navigating the Pilgrim is that she passed at her usual distance from the New York piers; and upon the evidence it must be held that this course of the Pilgrim was proper, under the circumstances, unless it can be found that it carried her dangerously near to the lighter, seen by her to be approaching from the westward in tow of the tug Howard. The witnesses from on board the Pilgrim declare that the distance between the lighter and the Pilgrim, as she passed, was entirely

[1] Reported by E. G. Benedict, Esq., of the New York bar.

safe. The lighter had been seen, signals had been exchanged between the Howard and the Pilgrim, the navigation of the vessels was not embarrassed by other vessels, and no reason is assigned why the Pilgrim should have passed dangerously near to the lighter. The distance between the two vessels is variously estimated from 300 to 1,200 feet; but, whatever the distance was, it was at the time deemed safe, not only by those on the Pilgrim, but also by the master of the tug, who was watching the Pilgrim as she approached. This witness was responsible for the lighter. He saw the swells as they came towards him. He turned his boat to head them, and stopped his engines. His actions, as narrated, very clearly indicate to me that, as the Pilgrim approached, he judged that neither her speed nor her course involved danger to his tug or his tow. He says, distinctly, that he had no fear of trouble from the swells. The man in charge of the lighter, who was seated on the forward bitts of the lighter, evidently was of the same opinion. He saw the swells coming, and he left the bitts, not because of threatening danger, but, as he says, simply to avoid getting wet. It is plain from his testimony that he judged that neither the speed nor the course of the Pilgrim was dangerous to his vessel. This testimony produced in behalf of the libelant shows that the swells seen to be approaching the tug and her tow were no greater than are ordinarily to be expected, and were not such as to create alarm. The deck hand of the tug describes the swells as "tidal waves," but exaggeration is to be expected from this witness; he having been knocked overboard by the lighter's mast, and compelled to swim for his life. The fact is that the waves that caused the lighter to dump her cargo were not considered dangerous by any of the experienced persons who saw them approaching. When the waves struck the lighter, however, she heeled over towards the tug, so far that her entire deck load of rails slid off into the sea between the tug and the lighter, carrying with it the lighter's rail, the planksheer on the starboard side, starting off three or four of the outside plank on that side about the length of 85 to 90 feet, taking the mast out of her, and tearing up her deck in the wake of the mast for 20 feet, and carrying over the mast, breaking the partners, and the deck beams on the deck forward. How this occurred, is stated by the mate of the lighter, in charge at the time. He says, when the swells came, the lighter heeled over, and he moved to the other side, from fear of getting wet. The swells kept on, and the lighter heeled more all the time, and finally, when the lighter's starboard rail was under water, the whole of the cargo went off at once, the lighter's deck then standing at an angle of 80 degrees. This witness makes it plain that the lighter began to heel as soon as the swell struck her, and that she never righted at all, but kept heeling over, until, when about on her beam end, she dumped all her cargo, and this notwithstanding she had been headed nearly head-on to the waves.

An attentive perusal of the testimony of the witnesses from the tug and the lighter conveys to my mind the impression that the effect produced by the waves upon the lighter was an effect wholly unexpected. And this fact at once gives rise to the conjecture that the dumping of the lighter's cargo is to be attributed to some other cause than waves of a dangerous character that fell upon her. Evidence given in regard to the construction of the lighter shows this conjecture to be well founded. She was a brig originally built to carry cargo below deck. She was cut down to be a lighter, and thereafter used to carry all her cargo on deck. The brig was a very sharp vessel. One witness says she was sharper than any other vessel he had ever seen put to such a business, and two witnesses declare her unsafe for such a cargo as she had on this occasion, because of her form. That she had often carried heavy cargoes on deck in safety, appears. She had frequently been loaded with rails as heavy, and heavier, than those she dumped on this occasion. She had never before dumped her cargo. Such evidence is, of course, deserving of consideration, but it is not conclusive, because the circumstances may have been different. It does not overthrow the fact, proved here, that the lighter dumped her cargo when meeting, nearly head-on, waves that were not considered dangerous by experienced persons who were observing them with care. She was a keel vessel, and might have been affected by tides and currents which did not appear on the surface. The presence of the drill might have caused eddies which affected her. Of this there is no evidence. But, as it seems to me, there is proof that the waves which caused the lighter to dump her cargo were not of a dangerous character, and were not such as to cause a properly constructed lighter, properly loaded, to dump her cargo as this lighter did.

This finding compels a dismissal of the libel.